## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DAVID REDDICK,** | **CIVIL ACTION** |
| **Plaintiff** | |
| | |
| **VERSUS** | **NO. 18-8568 c/w** |
| | **19-13111** |
| | |
| **MEDTRONIC, INC.,** | **SECTION: "E" (1)** |
| **Defendant** | |

***Applies to: Both Cases***

### ORDER AND REASONS

Before the Court is a Motion to Dismiss Plaintiff's Second Amended Complaint filed by Defendant Medtronic, Inc. ("Medtronic").[1] For the following reasons, Defendant's motion to dismiss with respect to Plaintiff's Louisiana Products Liability Act ("LPLA") claims is **GRANTED.**

### BACKGROUND

Plaintiff alleges the following three devices manufactured by Medtronic have been approved by the Food and Drug Administration ("FDA") as Class III medical devices:

(1) the Medtronic Sprint Quattro Secure Lead (the "Lead");

(2) the Medtronic Evera SVR Implantable Cardiac Defribillator (the "ICD"); and

(3) the Medtronic MyCareLink Patient Monitor and Software ("MyCareLink monitor").

---

[1] R. Doc. 73. All references to "R. Doc. #" are references to documents docketed in *Reddick v. Medtronic, Inc.*, Civil Action No. 18-8568, unless noted otherwise. Plaintiff David Reddick opposes this motion. R. Doc. 76. Defendant filed a supplemental memorandum in support of its motion to dismiss with respect to the issue of whether Plaintiff's LPLA claim should be dismissed as preempted and for failure to comply with the *Twombly* pleading requirements. R. Doc. 116. Plaintiff filed a response in opposition to the supplemental memorandum. R. Doc. 118. Defendant filed a reply to the response. R. Doc. 120.

Defendant agrees these three devices are Class III medical devices that have undergone the premarket approval process.[2]

Plaintiff alleges the Lead and the ICD were implanted in him in 2013,[3] and the MyCareLink monitor was used externally in conjunction with the other two Class III devices. According to Plaintiff, the ICD is implanted into the chest under the skin and contains a computer that tracks heart rate and heart rhythm. If the heart beats too fast or is out of rhythm, the ICD sends out a shock to get the heart back into rhythm.[4] The Lead connects to the ICD to provide the electricity that shocks the heart if the heart stops beating.[5]

Plaintiff alleges the following devices manufactured by Medtronic have been approved by the FDA as Class I and Class II Medtronic medical devices:[6]

(1) the Medtronic WireX (the "Wirex"),

(2) the Medtronic Vital Sync Virtual Patient Monitor Platform (the "Vital Sync Monitor"),

(3) the Medtronic Reveal LINQ Insertable Cardiac Monitor, and

(4) the Medtronic Reveal Insertable Loop Recorder.[7]

---

[2] R. Doc. 62 at ¶ 15; R. Doc. 116 at 7.

[3] R. Doc. 62 ¶ 12. Plaintiff alleges a Medtronic Reveal LINQ, a Class II medical device, also was implanted in him. R. Doc. 62 at 6, ¶ 9.

[4] R. Doc. 62 at ¶ 11.

[5] *Id.*

[6] R. Doc. 62 at 19-21, ¶¶ 16-17.

[7] Plaintiff makes specific allegations of unreasonably dangerous design against these products in paragraphs 16 and 17 of his Second Amended Complaint. In paragraphs 31, 32, and 35, Plaintiff makes conclusory allegations against the Medtronic products in globo regarding failure to warn and failure to conform to an express warranty. Plaintiff makes no factual allegations in support of these claims against the LINQ, the WireX, or the Virtual Sync Monitor. To the extent Plaintiff alleges the LINQ, the WireX, and the Virtual Sync Monitor violated the LPLA based on a failure to warn or a failure to conform to an express warranty, the claims are dismissed for failure to state a claim upon which relief may be granted.

Defendant has clarified the final two products are, in reality, one device.[8] Plaintiff does not contest this characterization in his subsequent replies.[9] The third and fourth devices will henceforth be referred to collectively as the "LINQ."

According to Plaintiff, the LINQ was implanted into Plaintiff's body to record the heart rate and rhythm anytime there was an unexplained episode to determine whether the event is related to a heart rhythm problem.[10] The WireX and the Vital Sync Monitor collect data from the implanted devices and send information to the patient's doctor.[11]

Plaintiff contends the Medtronic devices were implanted in him, or used in conjunction with the implanted devices, because he was misdiagnosed with Brugada Syndrome when, in reality, he suffered only from syncope, a medical term for fainting. Plaintiff alleges he experienced unnecessary shocks causing pain, emotional distress, disability, and anxiety due to false alarms from the defective Medtronic devices. The surgically implanted devices were removed on July 25, 2017, and Plaintiff alleges the Leads were revealed to be fractured at that time.[12]

The Defendant's motion to dismiss sought dismissal of all of Plaintiff's claims, namely (1) violation of the Louisiana Unfair Trade Practices Act ("LUTPA"); (2) breach of contract based on Defendant's alleged failure to "provide working functional sale products and medical device products and the related product systems in the medical care and health monitoring symptoms monitoring;" (3) breach of a contract based on Defendant's alleged failure "to provide reliable 24 hour and 7 day a week service to David

---

[8][8] R. Doc. 73-1 at 3.
[9] R. Docs. 76, 83, 90, 113, and 118.
[10] R. Doc. 62 at ¶ 11.
[11] *Id.*
[12] R. Doc. 62 at 2, ¶ 2 and at 11, ¶ 12.

3

Reddick;" and (4) violation of the LPLA.[13] In the Court's Order and Reasons dated April 14, 2020, the Court granted Defendant's motion to dismiss with respect to Plaintiff's LUPTA claim and Plaintiff's claim for breach of contract for failure to provide working functional sale products and medical device products and the related product systems.[14] The Court deferred ruling on Defendant's motion to dismiss with respect to Plaintiff's remaining claims under the LPLA and for breach of contract based on Defendant's alleged failure to provide reliable 24 hour and 7 day a week service to David Reddick. The Court allowed the parties to conduct discovery on whether the LPLA claim had prescribed and whether a service contract existed between Plaintiff and Defendant.[15]

In a status conference on April 24, 2020,[16] defense counsel requested that, rather than proceeding with discovery related to the prescription issue as to the LPLA claims, the Court consider Defendant's argument in its motion to dismiss that Plaintiff's LPLA claims should be dismissed as preempted by federal law or, alternatively, for failure to state a plausible claim under *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007). The Court granted Defendant's request and allowed the parties to file supplemental memorandums in support of, and in opposition to, the motion to dismiss insofar as it sought dismissal of the LPLA claims on grounds other than prescription.

## **LEGAL STANDARD**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court may dismiss a complaint, or any part of it, for failure to state a claim upon which relief may be granted

---

[13] R. Doc. 62 at ¶ 7.

[14] R. Doc. 98. In that Order, the court set forth the factual background of the case based on the allegations in Plaintiff's Second Amended Complaint. R. Doc. 62. The Court will not repeat those factual allegations here.

[15] The parties conducted discovery on the issue of whether a service agreement existed between Plaintiff and Defendant. Summary judgment was granted in Medtronic's favor on this claim. R. Doc. 174.

[16] R. Doc. 102.

if the plaintiff has not set forth factual allegations in support of his claim that would entitle him to relief.[17] However, "[t]he 12(b)(6) motion is not favored and should rarely be granted."[18] Instead, "resolution on the merits [is] preferred to disposition on the technical grounds of failure to state a claim."[19]

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[20] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[21] The court, however, does not accept as true legal conclusions or mere conclusory statements, and "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."[22] "[T]hreadbare recitals of elements of a cause of action, supported by mere conclusory statements" or "naked assertion[s] devoid of further factual enhancement" are not sufficient.[23]

In summary, "[f]actual allegations must be enough to raise a right to relief above the speculative level."[24] "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not

---

[17] *Twombly*, 550 U.S. at 555; *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007).
[18] *Airline Car Rental, Inc. v. Shreveport Airport Authority*, 667 F. Supp. 293, 295 (W.D. La. 1986) (citing *Madison v. Purdy*, 410 F.2d 99 (5th Cir.1969)).
[19] *Id.* (citation omitted).
[20] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).
[21] *Id.*
[22] *S. Christian Leadership Conference v. Supreme Court of the State of La.*, 252 F.3d 781, 786 (5th Cir. 2001) (citing *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993)).
[23] *Iqbal*, 556 U.S. at 663, 678 (citations omitted).
[24] *Twombly*, 550 U.S. at 555.

show[n]'—that the pleader is entitled to relief."[25] "Dismissal is appropriate when the complaint 'on its face show[s] a bar to relief.'"[26]

Defendant argues the claims against the Class III medical devices are preempted. Plaintiff questions whether federal preemption may be decided on a motion to dismiss but offers no support for his position that federal preemption should be treated differently from other motions to dismiss under Rule 12(b)(6).[27] When a successful affirmative defense, such as preemption, appears on the face of the pleadings, dismissal for failure to state a claim may properly be the subject of a Rule 12(b)(6) motion.[28] A preempted state law claim fails to state a claim on which relief may be granted because it is not plausible on its face.[29] In Sons v. Medtronic, Inc., the Western District of Louisiana granted a motion to dismiss LPLA claims under Rule 12(b)(6) based on federal preemption.[30] In *Parra v. Coloplast Corp.*, another section of this court dismissed with prejudice a plaintiff's LPLA claims with respect to a Class III medical device after finding preemption left the plaintiff without plausible claims.[31] In *Lasalle v. Pappas*, yet another section of this Court granted a 12(b)(6) motion to dismiss after finding parallel claims of violations of FDA regulations had not been alleged and the complaint failed to state a claim plausible on its face.[32] Once a potential claim asserted in a plaintiff's complaint is found to be

---

[25] *Id.* (quoting FED. R. CIV. P. 8(a)(2)).

[26] *Cutrer v. McMillan*, 308 F. App'x 819, 820 (5th Cir. 2009) (per curiam) (quotations omitted).

[27] R. Doc. 118 at 22-23.

[28] Fisher v. Halliburton, 667 F.3d 602, 609 (5th Cir. 2012); Frank v. Delta Airlines, Inc., 314 F.3d 195, 203 (5th Cir. 2002); *Kansa Reinsurance Co.*, Ltd. V. Congressional Mortg. Corp. of Texas, 20 F.3d 1362, 1366 (5th Cir. 1994.

[29] *Id.*

[30] *See Sons v. Medtronic*, 915 F.Supp.2d 776, 784 (W.D. La. 2013) (granting Defendant's motion to dismiss finding preemption of claims against products that underwent the FDA's pre-market approval process).

[31] *Id.*

[32] *Lasalle v. Pappas*, 2013 WL 1130726, at *1–*2 (E.D. La. Mar. 18, 2013)).

preempted by federal law, it must be dismissed.[33] The Court concludes the issue of preemption may be decided on a Rule 12(b)(6) motion to dismiss.

## LAW AND ANALYSIS

Sitting in diversity jurisdiction, the Court is bound by the substantive law of Louisiana.[34] The LPLA provides the exclusive remedy against a manufacturer for damages caused by its product..[35] A plaintiff cannot recover under any theory of liability against a manufacturer that is not set forth in the LPLA.  To hold a manufacturer liable under the LPLA, a plaintiff must establish "damage proximately caused by a characteristic of the product that rendered its product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity."[36] A product is unreasonably dangerous "if and only if" it is (1) unreasonably dangerous in construction or composition; (2) unreasonably dangerous in design; (3) unreasonable failure because of inadequate warning; or (4) unreasonably dangerous because it does not conform to an express warranty.[37]

The Defendant moves to dismiss the claims made with respect to the three Class III medical devices as preempted by federal law or, alternatively, for failure to state a plausible LPLA claim under *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007). The Defendant moves to dismiss the claims made with respect to the Class I and Class I medical devices for failure to state a plausible LPLA claim under Twombly.

---

[33] *See Malbroux v. Jancuska,* 2011 WL 3816104 (W.D. La. Aug. 29, 2011) (granting a 12(b)(6) motion to dismiss LPLA claims over a Class III medical device that were deemed preempted by federal law).
[34] *Learmonth v. Sears*, 710 F.3d 249 (5th Cir. 2013).
[35] La. Rev. Stat. Ann. § 9:2800.52
[36] La. Rev. Stat. Ann. § 9:2800.54(A).
[37] La. Rev. Stat. Ann. § 9:2800.54(B).

I.    **Plaintiff's LPLA claims with respect to the three Class III Medical Devices**

Defendant moves to dismiss the claims with respect to the Lead, the ICD, and the MyCareLink monitor, all Class III devices, because they are preempted by the express preemption provision of the Medical Device Amendments ("MDA"), 21 U.S.C. § 360k, to the Federal Food, Drug & Cosmetic Act ("FDCA"), 21 U.S.C. § 301, *et seq*.

Preemption holds that when federal statutes and regulations conflict with inconsistent state laws and regulations, the federal laws supersede.[38] Preemption often occurs when a federal law includes a preemption clause that expressly limits or restrains state powers to regulate in the same area of the law.[39] Preemption clauses, however, are often viewed narrowly so as to not occupy fields traditionally occupied by the states.[40]

The MDA was enacted as a mechanism to regulate medical products "while sweeping back state oversight schemes."[41] The MDA classifies and regulates medical devices according to the level of risk they pose: Class I devices are those that do not require "special controls to ensure safety and effectiveness;" Class II devices are those that require "special controls to ensure safety and effectiveness;" and Class III devices are those that require "premarket approval to ensure safety and effectiveness."[42] Class III devices are those that "presen[t] a potential unreasonable risk of illness or injury, or which are purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health."[43]

---

[38] Dennis Tosh, FDA ENFORCEMENT MANUAL § 183 *Preemption* (July 2019).
[39] *See Medtronic, Inc. v. Lohr* 518 U.S. 470, 484-85 (1996) (explaining the judicial task of interpreting a statutory provision that expressly preempts state law).
[40] *Id.*
[41] *Ezell v. Medtronic PLC*, 2018 WL 6928917 at *4 (W.D. La. Dec. 19, 2018).
[42] 21 U.S.C. § 360c(a) (2018).
[43] *Ezell*, 2018 WL 6928917 at *4 (quoting *Medtronic v. Lohr*, 518 U.S. at 477.)

These devices must undergo a "rigorous" premarket approval ("PMA") process in which "manufacturers must submit detailed information regarding the safety and efficacy of their devices" subject to many hours of FDA review. [44] The PMA process demands substantial time and resources from the device's manufacturer and imposes requirements including the duty not to deviate from the specifications in its approval process.[45]

Class III medical devices trigger the statutory preemption clause under the MDA, 21 U.S.C § 360k(a), which provides the MDA supersedes any state requirements that are "different from, or in addition to" federal regulations.[46] Pursuant to this statute, state law claims challenging Class III devices for their safety or effectiveness may be preempted if such claims attempt to impose different or additional requirements that undermine the premarket approval process.[47] The Supreme Court set forth a two-prong test in *Riegel v. Medtronic, Inc.* to determine the Section 360k(a) preemption of such claims.[48] First, the court must whether the FDA has established requirements for the particular medical device at issue.[49] Second, the court must determine whether the state law at issue creates a requirement related to the device's safety and effectiveness and is "different from, or in addition to," the federal requirement.[50] If so, the claims are preempted. If not, the claims are parallel and are not preempted.

---

[44] *Medtronic v. Lohr*, 518 U.S. at 477.
[45] *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 321-22 (2008).
[46] § 360k(a).
[47] *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 322 (2008).
[48] *Hughes v. Boston Scientific Corp.*, 631 F.3d 762, 767-68 (5th Cir. 2011).
[49] *Id.*
[50] *Id.*

**A.   Plaintiff's claims against the Class III Medical Devices under the first three theories of the LPLA are preempted.**

In his Second Amended Complaint, Plaintiff alleges all four LPLA theories of liability for the three Class III products.[51] Defendant argues these claims are preempted under Section 360k(a).[52] Plaintiff argues he has made parallel claims that are not preempted. Claims involving a Class III PMA medical device automatically satisfy the first prong of the *Riegel* test for preemption because the PMA process establishes specific "requirements applicable to [particular devices.]"[53],[54]

The Court must evaluate the four LPLA theories of actionable liability against these three Class III devices in light of the second prong of the *Riegel* test. The court must determine whether the state law at issue creates a requirement related to the device's safety and effectiveness and is "different from, or in addition to," the federal requirement. The critical issue under the second prong is whether Louisiana's "tort duties constitute 'requirements' under the MDA" and whether Plaintiff has alleged sufficient facts to set forth a parallel claim.[55] Preemption will apply to any LPLA claims that impose requirements different from, or in addition to, those set forth by the FDA. "[S]tate duties underlying negligence and strict-liability claims impose 'requirements' with respect to medical devices."[56]

---

[51] R. Doc. 62 at ¶¶ 7, 14, 15.

[52] R. Doc. 73.

[53] *Riegel v. Medtronic*, 552 U.S. at 322-23; *see also Bass v. Stryker Corp.*, 669 F.3d 501, 507 ("Devices that are approved through PMA procedures automatically satisfy the 'federal requirements' prong." (citing *Riegel*, 552 U.S. at 322)).

[54] The Court notes Defendant's preemption argument does not address the other Medtronic products Plaintiff alleges are at issue in this case, namely the Reveal LINQ, the Loop Recorder, WireX, and Vital Sync, as these are not Class III devices. R. Doc. 62 at 6, ¶ 9.

[55] *Riegel*, 552 U.S. at 323.

[56] *Cenac v. Hubbell*, Civil Action No. 093686, 2009 WL 10678961, at *2 (E.D. La. July 31, 2009) (citing *Riegel*, 552 U.S. at 323-24).

Parallel LPLA claims, those that are premised on violations of FDA regulations, are not preempted. For instance, in Bass v. Stryker Corp., the Fifth Circuit found the plaintiff sufficiently pleaded parallel claims, because:

> "[The plaintiff] pleaded: (1) he received a [medical product] implant; (2) the FDA had previously warned [the manufacturer product] of bioburden in excess of FDA regulations in its final rinse of the [medical devices]; (3) after [the plaintiff's] surgery, [the defendant] ultimately voluntarily recalled those [medical devices], including the [medical product] specifically used in [the plaintiff's] implant; (4) [the plaintiff] suffered from a loose [medical product] due to a lack of bony ingrowth; and (5) the lack of bony ingrowth is a known effect of an excess of bioburden and manufacturing residuals on [medical products]."[57]

The Fifth Circuit noted:

> "The key distinction between complaints that are sufficient to withstand a motion to dismiss and those that are not is … the existence of a manufacturing defect caused by a violation of federal regulations and allegations connecting a defect in the manufacture of the specific device to that plaintiff's specific injury."[58]

The Court finds Section 360k(a) preempts Plaintiff's first three LPLA claims. Plaintiff's fourth LPLA claim (unreasonable failure to conform to an express warranty) is preempted and, alternatively, fails to state a claim on which relief may be granted.

### 1.   Plaintiff's unreasonably dangerous construction claims are preempted.

Plaintiff alleges generalized claims of unreasonably dangerous construction under the LPLA.[59] This LPLA theory is available when "a product is unreasonably dangerous if, at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product."[60] In order to successfully establish a parallel claim alleging unreasonably dangerous

---

[57] 669 F.3d at 510.
[58] Id. at 511 (emphasis in original).
[59] R. Doc. 62 at 14, ¶ 13; 16, ¶ 15; and 27, ¶ 29.
[60] La. Rev. Stat. Ann. § 9:2800.55.

construction, a violation of federal manufacturing requirements must be alleged.[61] The complaint must also explain "how the manufacturing process failed or how it deviated from the FDA approved manufacturing process."[62]

Plaintiff alleges "Medtronic has admitted to a manufacturing defect of the Medtronic ICD and related products,"[63] but this a conclusory statement unsupported by factual allegations and is not accepted as true for purposes of this analysis. Plaintiff alleges the manufacturing process for the ICD failed or deviated from the FDA approved manufacturing process only by pointing to recalls of similar products. Plaintiff does not allege these recalled products are the same as the ICD implanted in him. Instead, Plaintiff alleges, "Medtronic has a history of manufacturing problems with products that are *similar to* the Medtronic products utilized by David Reddick as documented by the FDA."[64] Based on Plaintiff's allegations, the problems leading to the recalls of the similar ICDs are inconsistent with Plaintiff's alleged injury of "unnecessary shocks." The manufacturing defects identified in the recalls concern defects that *prevent* various versions of the ICD from delivering necessary shocks to the patient:

i. For Recall # Z-0585-2018 filed December 19, 2017, Plaintiff alleges the reported problem is "possible *prevention* of high and low voltage therapy"100;[65]

ii. For Recall #Z-2415-2018 filed June 21, 2018, Plaintiff alleges the reported problem is "potential for *loss* of high voltage"101;

iii. For the recall filed on January 22, 2018, Plaintiff alleges the recall is "DUE TO MANUFACTURING ERROR *PREVENTING* ELECTRICAL SHOCK

---

[61] *Rodriguez v. American Medical Systems, Inc.*, 597 Fed.Appx. 226, 230 (5th Cir. 2014) (finding that failure to plead a violation of any federal requirement relating to design or manufacturing amounted to failure to plead a parallel claim).
[62] *Funk v. Stryker Corp.*, 631 F.3d 777, 782 (5th Cir. 2011).
[63] R. Doc. 62 at ¶ 22.
[64] *Id*. at 18.
[65] *Id*. at 18 (emphasis added).

THERAPY."[66] Plaintiff further alleges the recall states: "This defect causes an out of specification gas mixture inside the device *and may prevent the device from delivering the electrical shock* needed to pace a patient's heartbeat or revive a patient in cardiac arrest. The *delay or inability to deliver a shock* to a patient in cardiac arrest or pace a patient's heart whose heartbeat is too slow could result in serious injury and/or death."

Taking Plaintiff's allegations as true, the manufacturing defects in the recalled ICDs, even if they were for the exact same product implanted in Plaintiff, involved a failure of necessary electrical shocks from being delivered; Plaintiff complains of excessive shocks actually being delivered to him. Alleging the recall of similar products for unrelated problems does not equal an allegation of a violation of federal manufacturing requirements or an allegation of how the manufacturing process failed or how it deviated from the FDA approved manufacturing process. Plaintiff has failed to allege a parallel LPLA claim for unreasonably dangerous manufacture.

Plaintiff also alleges in 2018 the FDA issued a warning letter to Medtronic in 2018 concerning its numerous adulterated products manufactured in Puerto Rico.[67] The Second Amended Complaint contains no allegations connecting the problems in manufacturing in Puerto Rico in 2018 to the ICD implanted in Plaintiff in 2013. The same is true for the supplements or modifications to Medtronic ICDs or MyCareLink Monitors and the FDA safety communication issue in 2019 – there are no allegations connecting these modifications or communications to the products used by David Reddick beginning in 2013.[68]

---

[66] *Id.* at 23, ¶ 22.
[67] *Id.* at 24, ¶ 23.
[68] *Id.* at ¶¶ 26-28.

Plaintiff alleges Medtronic's off-label promotion of the ICD is a violation of federal requirements.[69] Plaintiff alleges "the intended use of the product was not for [himself]… Medtronic violated FDA laws by promoting and allowing the surgical implant… for medical device products he did not need."[70] Plaintiff further alleges the ICD is advertised and recommended "to people who have fainted" as an example of an off-label promotion that is not approved by the FDA.[71] Plaintiff alleges the off-label use and Medtronic's advertising and promoting the ICD for an off-label use is a "violation[ ] of FDA laws and regulations."[72]

Federal law does prohibit off-label promotion when it is false or misleading,[73] but Plaintiff does not allege the off-label promotion of the ICD was fraudulent or misleading. It is less clear that federal law bans truthful off-label promotion, on which courts have come to differing conclusions.[74]

Generally, the FDCA does not prohibit off-label uses for drugs or medical devices.[75] Instead, courts often have found off-label claims to be preempted themselves or unlikely

---

[69] Plaintiff may argue that the off-label use if a violation of a federal requirement with respect to the other other devices and the other LPLA claims asserted. If so, those arguments are rejected for the same reasons stated herein.

[70] R. Doc. 62 at ¶ 25.

[71] *Id.* at 14, ¶12.

[72] *Id.*

[73] *Schouest v. Medtronic, Inc.*, 13 F.Supp.3d 692, 702 (S.D. Tex. Mar. 24, 2014).

[74] *Id.* (comparing "*Ramirez*, 961 F.Supp.2d at 990 ("While permitting health care providers to use devices in ways other than those anticipated by the FDA, the FDA prohibits device manufacturers from promoting the off-label use of their product."); *Carson v. Depuy Spine, Inc.*, 365 Fed.Appx. 812, 815 (9th Cir.2010) ("[W]hile doctors may use a drug or device off-label, the marketing and promotion of a Class III device for unapproved use violates Section 331 of the *703 FDCA."), with *Dawson v. Medtronic, Inc.*, 2013 WL 4048850, at *6 (D.S.C. Aug. 9, 2013) ("This court is not convinced that off-label promotion violates the FDCA. Consequently, any state laws proscribing off-label promotion would establish requirements 'different from[ ] or in addition to[ ] any requirement' under the MDA and would be expressly preempted" (citing 21 U.S.C. § 360k(a))); *Caronia*, 703 F.3d at 154 ("The FDCA and its accompanying regulations do not expressly prohibit the 'promotion' or 'marketing' or drugs for off-label use.")").

[75] *See United States v. Caronia*, 703 F.3d 149 (2d Cir. 2012) (finding that the FDCA "does not expressly prohibit or criminalize off-label promotion").

to be viable.[76] Faced with a similar question, the Tenth Circuit found Congress intended to protect the "liberty of doctors and patients to use approved devices in any manner they wish—including off-label—instructing that '[n]othing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device."[77] Plaintiff does not allege that Louisiana law prohibits the alleged off-label use, but even if she did, a state law restraining such off-label uses would be an additional requirement that is preempted by Section 360k(a).[78] The allegation that there has been an off-label promotion of the ICD does not satisfy the requirement that Plaintiff identify with sufficient particularity the federal laws and regulations that have been violated.

Plaintiff does not allege the particular ICD implanted into Plaintiff had a manufacturing defect, does not allege a violation of federal manufacturing requirements with respect to the ICD, and does not make factual allegations as to how the manufacturing process for the ICD failed or deviated from FDA requirements.

Plaintiff does not allege *any* facts supporting a dangerous construction claim with respect to the Lead and MyCareLink monitor. Plaintiff's petition also fails to identify any manufacturing requirements imposed by the FDA or to allege a violation of or deviation from any FDA approved manufacturing process with respect to these two devices.

With respect to all three Class III devices, Plaintiff resorts to conclusory statements about construction that mirror the LPLA and vaguely allege violations of federal

---

[76] *See, e.g., Otis-Wisher v. Fletcher Allen Health Care, Inc.*, 951 F.Supp.2d 592, 596 (D. Vt. June 25, 2013) (explaining that "[physicians] may use FDA approved medical devices for off-label uses with a patient's informed consent."); *Otis-Wisher v. Medtronic*, 616 Fed.Appx. 433, 435 n.2 (2d Cir. 2015) (suggesting off-label use claims were unlikely to be viable).

[77] *Caplinger v. Medtronic, Inc.*, 784 F.3d 1335, 1344 (10th Cir. 2015) (citing 21 U.S.C. § 396).

[78] *Id*. at 1344.

requirements without specifying what they are. Plaintiff's claims of unreasonably dangerous construction under the LPLA are preempted.

### 2. Plaintiff's unreasonably dangerous design claims are preempted.

Plaintiff brings claims of unreasonably dangerous design under the LPLA.[79] The unreasonably dangerous design theory of the LPLA requires Plaintiff to show (1) there existed an alternative design for the product that was capable of preventing the claimant's damage; and (2) the design defect's likelihood and gravity outweigh the burden of adopting the alternative design.[80] To survive, these claims must be parallel to federal regulations. Failure to connect an alleged violation of federal design requirements to the LPLA claims is fatal to those claims.[81] Plaintiff fails to allege any failure in the design processes of the three Class III devices, fails to allege any alternative design for these devices, and similarly fails to allege facts that support a finding of deviation from FDA-approved designs for them.

Plaintiff alleges the software in the ICD and the MyCareLink monitor "had a defective design,"[82] but this is a conclusory statement unsupported by any facts. With respect to the MyCareLink monitor, Plaintiff fails to allege a specific violation of federal law. Instead, Plaintiff alleges only that: "Medtronic violated and contravened FDA laws including but not limited to 21 U.S.C.A. § 360c(a)(1)(C) regarding the Medtronic My Carelink Patient Monitor."[83] 21 U.S.C. § 360c merely outlines the classification of devices intended for human use. Section 360c(a)(1)(C) defines Class III PMA medical devices and

---

[79] R. Doc. 62 at ¶ 15.
[80] La. Rev. Stat. Ann. § 9:2800.56.
[81] *Parra v. Coloplast Corp.* 2017 WL 24794 *3 (E.D. La. Jan. 3, 2017) (citing *Rodriguez v. American Medical Systems, Inc.*, 597 Fed.Appx. 226, 230 (5th Cir. 2014)).
[82] R. Doc. 62 at 16, ¶ 15.
[83] *Id.* at 17, ¶ 15.

provides that such devices are subject "to premarket approval to provide reasonable assurance of its safety and effectiveness."[84] As another Section of this Court explained in *Cenac v. Hubbell*, allegations of a violation of a federal regulation that "simply governs the applicability of the other regulations and imposes no specific requirements on manufacturers of medical devices" are "too vague to support a parallel claim."[85] Section 360c(a)(1)(C) imposes no specific requirements.

Further, the FDA studied the design of the three Class III devices through the premarket approval process and approved them. Section 360k(a) preemption exists precisely to prevent a jury from second-guessing the FDA's premarket approval of a design, regardless of whether it is flawed.[86] The Court finds the unreasonably dangerous design claims satisfy the second prong of *Riegel* and are preempted.[87] Plaintiff's claims of unreasonably dangerous design under the LPLA are preempted.

### 3.   Plaintiff's unreasonably dangerous failure to provide adequate warning claims are preempted.

Plaintiff brings unreasonable failure to warn claims under the LPLA by alleging "[t]he Medtronic products are unreasonably dangerous because an adequate warning about the products has not been provided concerning the numerous problems, and malfunctions of these products and their component parts as stated in this complaint and in violation of the FDA laws."[88] To successfully plead a parallel failure-to-warn claim, Plaintiff must show: (1) the product was unreasonably dangerous because an adequate

---

[84] 21 U.S.C. § 360c(a)(1)(C).

[85] *Cenac v. Hubbell*, 2010 WL 4174573 at *5 (E.D. La. Oct. 21, 2010).

[86] *Gomez v. St. Jude Medical Daig. Div. Inc.*, 442 F.3d 919, 930 (5th Cir. 2006).

[87] *See Malbroux v. Jancuska*, No. 11–421, 2011 WL 3816104, at *1, 3 (W.D.La. Aug. 29, 2011) (dismissing claim that penile prosthesis had a defective design because the state claims would have required more "than what the FDA already required." (citing *Cowen v. Am. Med. Systems, Inc.*, 2006 WL 2543704 at *2 (E.D. Mich. 2006))).

[88] R. Doc. 62 at ¶¶ 31, 35.

17

warning was not provided for a potentially dangerous characteristic existing at the time the product left its manufacturer's control; (2) "the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic;" and (3) these failures deviated from FDA warning requirements.[89]

Plaintiff's Second Amended Complaint makes no mention of applicable FDA-approved warnings and contains no allegations that any of the Class III devices deviated from any accepted warnings and instructions. Plaintiff does not allege what the warning was, why it was inadequate, what potentially dangerous characteristic any device had, or how failures deviated from FDA warnings and requirements. Plaintiff cites prior Medtronic recalls and warnings, but fails to sufficiently connect them to the devices used by him and to the injuries he claims to have suffered.[90] By failing to clearly allege any violation of FDA-approved warning or instruction, the failure to warn claims remain too general and risks imposing liability on Defendant for a failure to give a warning that was not sanctioned by the FDA. Accordingly, the failure to warn claims are preempted.

**B.    Plaintiff's claims that the Class III Medical Devices are unreasonably dangerous because they do not conform to an express warranty are preempted and, alternatively, fail to meet the *Twombly* and *Iqbal* pleading requirements.**

Plaintiff's Second Amended Complaint alleges a breach of express warranty claim against the three Class III devices, but Plaintiff alleges only facts related to the ICD and Lead with respect to this claim. Accordingly, the claims against the MyCareLink monitor based on breach of express warranty are dismissed with prejudice for failure to state a claim upon which relief may be granted. The Court must examine whether the LPLA

---

[89] La. Rev. Stat. Ann. § 9:2800.57; *Gomez*, 442 F.3d at 930.
[90] R. Doc. 62 at 26, ¶ 28.

breach of express warranty claims against the ICD and the Leads are preempted or, even if they are not preempted, whether the allegations fail to meet the *Twombly* and *Iqbal* pleading requirements.

With respect to an LPLA breach of express warranty claim, the plaintiff must allege the product was unreasonably dangerous because: (1) an express warranty on the product was made by the manufacturer; (2) the express warranty induced the plaintiff to use the product; and (3) the plaintiff's damage was proximately caused by the breach because the express warranty was untrue.[91]

Generally, express warranty claims are not inherently preempted.[92] In arguing his claims concerning the Leads are not preempted, Plaintiff directs the Court's attention to *Wildman v. Medtronic, Inc.*[93] In that case, the Fifth Circuit held the plaintiff's claim for breach of express warranty under Texas law was not preempted by the FDCA because the claim challenged a warranty that went "above and beyond any guarantee the FDA expressly or implicitly approved."[94] The court described the Medtronic warranty at issue in that case as follows:

> The Statement begins by asserting that although other manufacturers "may state that their batteries have a longevity greater than 9 years, it's important to understand that many other factors and components are involved in determining the overall longevity of an implanted medical device."[95]

The Fifth Circuit emphasized this warranty went "above and beyond" any guarantee the FDA approved because:

---

[91] La. Rev. Stat. Ann. § 9:2800.58.

[92] *See Schouest v. Medtronic, Inc.*, 13 F.Supp.3d 692, 707 (S.D. Tex. 2014) (explaining that an express warranty claim could survive as long as a plaintiff rests such claims upon "false warranties that Medtronic voluntarily and falsely made beyond the federally approved warning").

[93] 874 F.3d 862 (5th Cir. 2017).

[94] *Id*. at 867 (citing *Gomez*, 442 F.3d at 932).

[95] *Id*. at 869.

"The Statement cannot reasonably be read as anything other than a claim of comparative advantage over competitors that vouch only for the life of their batteries. Medtronic is telling consumers why its product is superior."[96]

If the express warranty given does not conflict with the premarket approval process, arises "from representations of the parties[,] and [is] made as the basis of the bargain between them," then it might avoid MDA preemption.[97] A breach of warranty claim under the LPLA, however, requires the express warranty to be untrue, which goes beyond mere enforcement of the federal requirements.[98] As the Fifth Circuit explained, scrutinizing warranties for truthfulness is "potentially inconsistent with the federal regulatory scheme" because it would impose duties arising under the state's breach of warranty statute upon representations approved by the FDA through the premarket approval process.[99]

Plaintiff alleges he was told the ICD "would last a lifetime" and that it "had a lifetime warranty and guaranty."[100] He alleges the Lead "failed to comply with the verbally [sic] life time warranty he was provided" and "failed to comply with the 10 and 11 year warranty that was provided to David Reddick through his physicians, and medical providers, the public."[101] Plaintiff fails to allege what, if any, federal regulation or FDA approval was violated by the violation of an express warranty. Plaintiff's vague and conclusory allegations are insufficient. The Fifth Circuit upheld the dismissal of a Texas

---

[96] *Id.*

[97] *Gomez*, 442 F.3d at 932 (quoting *Mitchell v. Collagen Corp.*, 126 F.3d 902, 915 (7th Cir. 1997)).

[98] La. Rev. Stat. Ann. § 9:2800.58.

[99] *Gomez*, 442 F.3d at 932.

[100] R. Doc. 62 at 10, ¶ 12.

[101] *Id* at 11. In his opposition to Defendant's motion to dismiss, Plaintiff attaches a Sprint Quattro Lead brochure, which includes charts showing Defendant's product has a product life of eleven years whereas competing products by St. Jude Medical and Boston Scientific have product lives of six and eleven years. R. Doc. 76-2 at 2. The Court has not considered documents outside the pleadings and has not converted the motion to dismiss to a motion for summary judgment.

deceptive trade practices claim when the plaintiff failed "to allege whether or how [the manufacturer's] marketing materials deviated from FDA-approved requirements."[102] In this case, there is no opportunity to compare an express representation of Medtronic to what was approved for marketing or labelling by the FDA because neither is alleged by Plaintiff. Plaintiff's conclusory statements are unsupported by factual allegations. Plaintiff has failed to allege a parallel LPLA claim for breach of express warranty. Plaintiff's claims for breach of express warranty are preempted. Furthermore, Plaintiff has failed to plead sufficient facts to establish plausible claims under the LPLA for breach of an express warranty under *Twombly* and *Iqbal*[103] with respect to the ICD and the Lead.

### C.   Plaintiff's off-label claim is preempted.

Plaintiff raises an off-label promotion claim for the ICD that does not fit under one of the four LPLA theories.[104] Plaintiff alleges "the intended use of the product was not for [himself]... Medtronic violated FDA laws by promoting and allowing the surgical implant... for medical device products he did not need."[105] Plaintiff further alleges that the ICD is advertised and recommended "to people who have fainted" as an example of an off-label promotion that is not approved by the FDA.[106] Off-label promotion is not an available theory under the LPLA because it contains an exclusive remedy provision limiting it to the four theories analyzed above.[107]

---

[102] *Rodriguez*, 597 F. App'x at 230.
[103] *See Wildman v. Medtronic, Inc.*, 874 F.3d 862, 867-68 (5th Cir. 2017) (affirming the 12(b)(6) dismissal of LPLA claims in a Class III medical device case for failing to state claims that paralleled FDA requirements).
[104] R. Doc. 62 at 14, ¶ 12.
[105] *Id*. at ¶ 25.
[106] *Id*. at 14, ¶12.
[107] La. Rev. Stat. Ann. § 9:2800.52; *See Stahl v. Novartis Pharm. Corp*., 283 F.3d 254, 261 (5th Cir. 2002) (denying an intentional tort claim in a pharmaceutical product liability claim because it was not an available remedy under the LPLA).

Generally, the FDCA does not prohibit off-label uses for drugs or medical devices.[108] Courts often have found off-label claims to be preempted or unlikely to be viable.[109] Faced with a similar question, the Tenth Circuit found Congress intended to protect the "liberty of doctors and patients to use approved devices in any manner they wish—including off-label—instructing that '[n]othing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device."[110] A state law restraining such off-label uses would be an additional requirement that is preempted by Section 360k(a).[111] Plaintiff fails to state with sufficient particularity the federal laws, regulations, or device approval that is violated by the off-use promotion. To the extent that Plaintiff asserts an off-label promotion claim, it is preempted.

## II. Plaintiff's allegations with respect to the Class I and Class II Medical Devices are not sufficient to state LPLA claims upon which relief may be granted.

Plaintiff makes only LPLA defective design claims against the WireX, the Vital Sync Monitor, and the LINQ, all Class I and Class II medical devices. Because they are Class I and Class II medical devices, federal preemption is not an issue. Instead, the Court must determine whether the allegations of Plaintiff's Second Amended Complaint are sufficient to state claims for defective design under the LPLA.

---

[108] *See United States v. Caronia*, 703 F.3d 149 (2d Cir. 2012) (finding that the FDCA "does not expressly prohibit or criminalize off-label promotion").
[109] *See, e.g., Otis-Wisher v. Fletcher Allen Health Care, Inc.*, 951 F.Supp.2d 592, 596 (D. Vt. June 25, 2013) (explaining that "[physicians] may use FDA approved medical devices for off-label uses with a patient's informed consent."); *Otis-Wisher v. Medtronic*, 616 Fed.Appx. 433, 435 n.2 (2d Cir. 2015) (suggesting off-label use claims were unlikely to be viable).
[110] *Caplinger v. Medtronic, Inc.*, 784 F.3d 1335, 1344 (10th Cir. 2015) (citing 21 U.S.C. § 396).
[111] *Id*. at 1344.

Under the LPLA, to establish a prima facie case the claimant must establish four elements: (1) that the defendant is a manufacturer of the product; (2) that the claimant's damage was proximately caused by a characteristic of the product; (3) that this characteristic made the product "unreasonably dangerous"; and (4) that the claimant's damage arose from a reasonably anticipated use of the product by the claimant or someone else." [112] Plaintiff alleges Medtronic manufactured the products, that characteristics of the products were the proximate causes of Plaintiff's damages, that these characteristics made the products unreasonably dangerous, and that Plaintiff's damages arose from a reasonably anticipated use of the products.[113]

The third element, that the product was unreasonably dangerous, is limited by the LPLA to four theories of actionable liability: (1) unreasonably dangerous construction; (2) unreasonably dangerous design; (3) unreasonable failure to provide adequate warning; and (4) unreasonable failure to conform to an express warranty.[114]  Plaintiff makes only LPLA defective design claims against the WireX, the Vital Sync Monitor, and the Loop. A product is unreasonably dangerous in design if, at the time it left the manufacturer's control, (1) there existed an alternative design that was capable of preventing the damage and (2) the likelihood the design would cause damage and the gravity of that damage outweighed the burden on the manufacturer of adopting the alternative design.[115] Plaintiff alleges only that the products are unreasonably dangerous in design "for the same reasons stated in the previous paragraph and this petition."[116]

---

[112] *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 260-61 (5th Cir. 2002) (citing La. Rev. Stat. Ann. § 2800.54(A)).
[113] R. Doc. 62 at ¶ 29.
[114] La. Rev. Stat. Ann. § 9:2800.54.
[115] La. R.S. 9:2800.57.
[116] R. Doc. 62 at ¶ 3.

It is not necessary for the Court to determine whether Plaintiff has adequately pleaded all the elements of an LPLA defective design claim because Plaintiff has failed to plead at least one essential element – that there were existing alternative designs for the Linq, the WireX, and the Vital Sync Monitor at the time they left they control of Medtronic and that those alternative designs were capable of preventing the damage suffered by Plaintiff.[117]

### A.    The LINQ

With respect to the LINQ, Plaintiff generally alleges the purpose and operation of the device and states in a conclusory manner that the LINQ has defectively designed software.[118] Plaintiff failed to allege the unreasonably dangerous design defect incorporated into the LINQ or its software or that an alternative design capable of preventing the damage was available at the time the product left the manufacturer's control.[119],[120] The only paragraph heading in Plaintiff's Second Amended Complaint that mentions alternative design is paragraph 21, and the body of that paragraph references only the ICD. Even with respect to the ICD Plaintiff makes no allegations with respect to an alternative design and, instead, alleges that Plaintiff should have pursued more conservative treatment.[121] With respect to the LINQ, Plaintiff points only to the recall of a Medtronic "Reveal LINQ Insertable Cardiac Monitor" in 2016 for an issue related to its battery replacement indicator; Plaintiff  does not allege the model of LINQ implanted in him in 2013 and the model of the one recalled in 2016 are the same and does not connect

---

[117] La. Rev. Stat. Ann. 9:2800.56.
[118] R. Doc. 62 at ¶¶ 11 and 16.
[119] La. Rev. Stat. Ann. § 9:2800.56.
[120] Although Plaintiff titles paragraph 21 of the Second Amended Complaint "Facts and Alternative Design," in fact no allegations regarding alternative design of any of the devices are included. In paragraph 40, Plaintiff alleges in a conclusory manner that alternatives in design existed that could have prevented the damage but provides no factual allegations in support of this assertion.
[121] R. Doc. 62 at ¶ 21.

the reason for the 2016 recall to any problem with Plaintiff's LINQ device inserted in 2013.[122]

Plaintiff alleges the LINQ was "unknowingly... planted in him,"[123] but does not explain under which of the four available LPLA theories this allegedly wrongful act would fall.[124] Plaintiff did not bring a medical battery claim in the Second Amended Complaint and, even if he had, did not make any allegations that would point to Medtronic as the responsible defendant under such a claim.[125]

Even though the LINQ is not a Class III device and preemption is not an issue, Plaintiff alleges that Medtronic violated and contravened FDA laws including but not limited to 21 U.S.C.A. § 360c(a)(1)(C) and 21 U.S.C. § 360d.[126] 21 U.S.C. § 360c merely outlines the classification of devices intended for human use. Section 360c(a)(1)(C) defines Class III PMA medical devices and provides that such devices are subject "to premarket approval to provide reasonable assurance of its safety and effectiveness."[127] As mentioned previously, even if the LINQ were a Class III device, such allegations of a violation of a federal regulation that "simply governs the applicability of the other regulations and imposes no specific requirements on manufacturers of medical devices" are "too vague to support a parallel claim."[128] Neither does this allegation satisfy the requirements for an LPLA unreasonably dangerous design claim.

---

[122] R. Doc. 62 at 20, ¶ 16.

[123] R. Doc. at 8, ¶ 11.

[124] La. Rev. Stat. Ann. § 9:2800.54.

[125] *See Lugenbuhl v. Dowling*, 701 So.2d 447, 452 (La. 1997) (explaining that while medical battery is not a favored theory of liability under Louisiana law, the lack of informed consent might constitute a breach of duty by the doctor).

[126] R. Doc. 62 at 20, ¶ 16. 21 U.S.C. 360(d) has to do with the registration of producers of drugs or devices and it is not clear what relevance it has in this case.

[127] 21 U.S.C. § 360c(a)(1)(C).

[128] 2010 WL 4174573 at *5.

Finally, Plaintiff relies on the doctrine of *res ipsa loquitur* to suggest the Court may infer Medtronic's negligence with respect to the LINQ.[129] Plaintiff alleges the LINQ "did the opposite for which it was intended and approved for and it caused David Reddick injury, suffering, damages and to become disabled and permanently disabled. It harmed his health and well-being and placed his life at risk." *Res ipsa loquitor* is an evidentiary doctrine that may be applied once factual evidence has been submitted.[130] It may not "be alleged in a plaintiff's complaint in order to satisfy a plaintiff's burden at the pleading stage."[131] It also is not clear that the doctrine of *res ipsa loquitor* would support the plaintiff's claims, even at a later stage in the litigation. The doctrine permits an inference of negligence only when other possible causes of the alleged injuries do not exist.[132] Medical devices might fail for a variety of reasons that do not constitute the manufacturer's negligence–such as poor surgical techniques or body rejection.[133] Reliance on this evidentiary doctrine does not make up for Plaintiff's failure to plead the allegations necessary to bring a claim against the LINQ for unreasonably dangerous design under the LPLA.

### B.     The WireX

With respect to the WireX, Plaintiff generally alleges the purpose and operation of the device[134] and makes a conclusory allegation that the WireX "had a defective software design because it was not secure from hacking and was subject to malfunction."[135]

---

[129] R. Doc 62 at ¶ 16.

[130] *Rice v. Cornerstone Hosp. of W. Monroe, L.L.C.*, 674 Fed.Appx. 391, 392 (5th Cir. 2017).

[131] *Charles v. K-Patents, Inc.*, 2018 WL 9869532 (E.D. Tex. Aug. 10, 2018) (citing *Alcoa, Inc. v. Contech Constr. Props., Inc.*, No. 05-880, 2006 WL 8432990, at *3-4 (W.D. Tex. Apr. 26, 2006).

[132] *Jesionowski v. Boston & M. R.R.*, 329 U.S. 452, 456 (1947).

[133] *Clark v. Medtronic, Inc.*, 572 F. Supp. 2d 1090, 1094-95 (D. Minn. 2008).

[134] R. Doc. 62 at ¶ 11

[135] *Id.* at 21, ¶ 17.

Otherwise, Plaintiff failed to allege the unreasonably dangerous design defect incorporated into the WireX and did not allege that an alternative design capable of preventing the damage was available at the time the product left the manufacturer's control.[136]

Even though the WireX is not a Class III device and preemption is not an issue, Plaintiff alleges that Medtronic violated and contravened FDA laws including but not limited to 21 U.S.C.A. § 360c(a)(1)(C).[137] As mentioned previously, such allegations of a violation of a federal regulation that "simply governs the applicability of the other regulations and imposes no specific requirements on manufacturers of medical devices" are "too vague to support a parallel claim."[138] Neither does this allegation satisfy the requirements for an LPLA unreasonably dangerous design claim against the WireX.

### C.    The Vital Sync Monitor

With respect to the Vital Sync Monitor, Plaintiff generally alleges the purpose and operation of the device[139] and makes a conclusory allegation that the Vital Sync Monitor had a defective software design because it required regular upgrades and could not keep up with general information systems, because it was not secure from hacking, and because it was subject to malfunction.[140] Plaintiff failed to allege facts supporting his claim that an unreasonably dangerous design defect was incorporated into the Vital Sync Monitor and failed to allege that an alternative design capable of preventing the damage was available at the time the product left the manufacturer's control.[141] Plaintiff alleges only that "the

---

[136] La. Rev. Stat. Ann. § 9:2800.56.
[137] R. Doc. 62 at 20, ¶ 16. 21 U.S.C. 360(d) has to do with the registration of producers of drugs or devices and it is not clear what relevance it has in this case.
[138] 2010 WL 4174573 at *5.
[139] R. Doc. 62 at ¶ 11.
[140] R. Doc. 62 at 21, ¶ 17.
[141] La. Rev. Stat. Ann. § 9:2800.56.

product failed due to problems and glitches in the software, technical failures in the software, possible hacking, due to technical failures by Medtronic with wireless connectivity, including but not limited to the internet being down or out. , [*sic*] directly or indirectly using analog or Bluetooth technology or radio frequency that could be hacked."[142] These are conclusory allegations and speculative statements with no factual support provided.

Even though the Vital Sync Monitor is not a Class III device and preemption is not an issue, Plaintiff alleges that Medtronic violated and contravened FDA laws including but not limited to 21 U.S.C.A. § 360c(a)(1)(C). [143] As mentioned previously, such allegations of a violation of a federal regulation that "simply governs the applicability of the other regulations and imposes no specific requirements on manufacturers of medical devices" are "too vague to support a parallel claim."[144] Neither does this allegation satisfy the requirements for an LPLA unreasonably dangerous design claim against the Vital Sync Monitor.

Plaintiff fails to support his conclusory and speculative allegations with sufficient facts to adequately state an LPLA unreasonably dangerous design claim against the WireX, Vital Sync Monitor, and LINQ. Those claims will be dismissed with prejudice.

## III.   Plaintiff's request for leave to amend is denied.

In Plaintiff's supplemental opposition to the motion to dismiss, he requests leave to file a third amended complaint, if necessary.[145] The Plaintiff filed this action in state

---

[142] R. Doc. 62 at 18, ¶ 17.

[143] *Id*. at 20, ¶ 16. 21 U.S.C. 360(d) has to do with the registration of producers of drugs or devices and it is not clear what relevance it has in this case.

[144] 2010 WL 4174573 at *5.

[145] R. Doc. 118 at 24.

court on August 16, 2018.[146] Almost a year later, on July 10, 2019, the Court granted plaintiff leave to file an amended complaint,[147] requiring Plaintiff to address the seven devices/software listed in paragraph six of Plaintiff's proposed amended complaint and to:

> (1) Allege facts addressing Defendant's argument that Plaintiff's claims have prescribed on their face;[148]

> (2) Allege facts addressing Defendant's argument that Plaintiff's claims are preempted by federal law;[149] and

> (3) For each device or software alleged as a basis of liability, allege facts showing the defective nature of the device or software, the causes of action with respect to the device or software, and the damages claimed with respect to the device or software.

Plaintiff's Second Amended Complaint was filed on July 23, 2019.[150]

Rule 15(a) "requires the trial court to grant leave to amend freely, and the language of this rule evinces a bias in favor of granting to amend."[151] A district court must possess a "substantial reason" to deny a motion under Rule 15(a).[152] In deciding whether to grant leave under Rule 15(a), courts may consider factors such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of the amendment."[153] Motions to amend are "entrusted to the sound discretion of the district court,"[154] and a court may properly refuse

---

[146] R. Doc. 1-1.

[147] R. Doc. 60.

[148] *See* R. Doc. 10-1 at 4-7.

[149] *See id.* at 7-10.

[150] R. Doc. 62.

[151] *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002) (internal quotation marks omitted).

[152] *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004).

[153] *Jones v. Robinson Prop. Grp., LP*, 427 F.3d 987, 994 (5th Cir. 2005).

[154] *Quintanilla v. Tex. Television, Inc.*, 139 F.3d 494, 499 (5th Cir. 1998).

to grant leave to amend if the plaintiff failed to cure a defect after being given earlier opportunity to do so.[155]

In this case, the original complaint was filed in state court on August 16, 2018, over two years ago. Plaintiff already has been given leave to amend and given specific instructions to address the arguments in Defendant's Motion to Dismiss, including that the claims are preempted by federal law and the lack of allegations concerning the defective nature of each device or piece of software. The Court finds Plaintiff's failure to cure deficiencies by the amendment previously allowed is a substantial reason to deny his request for leave to amend a third time.

## CONCLUSION

**IT IS ORDERED** that Defendant's motion to dismiss[156] is **GRANTED** with respect to Plaintiff's Louisiana Product Liability Act claims and those claims are **DISMISSED WITH PREJUDICE**.[157]

**New Orleans, Louisiana, this 2nd day of March, 2021.**

_____

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[155] Arthur R. Miller et al., *When Leave to Amend May Be Denied*, 6 Fed. Prac. & Proc. Civ. § 1487 (3d ed.). *See, e.g., Smith v. Ayres*, 845 F.2d 1360, 1366 (5th Cir. 1988) (denying a third leave to amend because plaintiff failed to "remedy the most basic deficiencies in his earlier complaints"); Zucco *Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) (denying leave to amend after plaintiff subsequently failed to add the requisite particularity in its claims the first two times).

[156] R. Doc. 73.

[157] Medtronic's Rule 12(f) Motion to Strike Plaintiff's Exhibits Offered in Support of his Opposition to Medtronic's Rule 12(b)(6) Motion to Dismiss is **GRANTED**. The documents offered by Plaintiff as exhibits are not incorporated by reference into the Second Amended Complaint. Nor are they matters of public record the Court may judicially note. R. Doc. 119.